1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NICHOLE M. MAGNI,

         Plaintiff,

   v.

CAROLYN W. COLVIN,

         Defendant.

Case No.16-cv-02624-EDL

ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT;
DENYING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT; REMANDING
CASE

       On May 16, 2016, Plaintiff Nicole Magni filed this lawsuit pursuant to 42 U.S.C. Section

405(g), seeking judicial review of the Commissioner of Social Security's decision to deny her

claims for disability insurance benefits and supplemental security income payments.  On

September 21, 2016, Plaintiff moved for summary judgment, asking the Court to reverse and

remand for an award of benefits, or alternatively to remand for a new hearing before an

Administrative Law Judge ("ALJ").  On October 7, 2016, the Commissioner filed a combined

opposition to Plaintiff's motion and a cross motion for summary judgment, asking the Court to

affirm the Commissioner's decision.  For the reasons set forth below, Plaintiff's motion for

summary judgment is granted and the matter is remanded for a new hearing.  The Commissioner's

cross motion for summary judgment is denied.

I.       **BACKGROUND**

    A.     **Factual Background**

       Ms. Magni was 30 years old as of her claimed disability onset date of February 1, 2008**.**

AR 51, 80, 92, 276. As of December 31, 2012, the date she last met the insured requirements of

the Act, she was 35 years old. AR 282.  Plaintiff has a two year college degree in accounting.  AR

52-53, 92. Her most recent job was from 2004 to 2006 as a grocery checker, but she quit that job

due to fear of leaving the house which resulted in excessive absences up to four times per week. AR 95.  She has also worked as a loan processor, data entry operator, mortgage loan shipper, and bookkeeper.  AR 54-55.

### B.    Procedural History

Ms. Magni filed applications for Social Security disability insurance benefits under Title II and supplemental security income under Title XVI of the Act on April 4, 2011, alleging a disability onset of February 1, 2008.  AR 276-81.  Her applications were denied on initially and upon reconsideration, after which she requested an ALJ hearing.  AR 166-70, 173-78, 179-80. A hearing was held on September 13, 2012.  AR 46-73, 204-05.  By unfavorable decision dated October 19, 2012, the ALJ found that Ms. Magni was not disabled.  AR 140-50.  On January 17, 2014, the Appeals Council vacated that decision, finding a harmful error in the ALJ's evaluation of her bipolar disorder as being non-severe, ordering that the mental disorder is legally severe at step two and that it be evaluated beyond that step on remand. AR 157-61.  Following a remand hearing on June 9, 2014, a different ALJ issued an unfavorable decision dated September 22, 2014.  AR 14-26.  That decision, which is the subject of this action, found that Ms. Magni retains the capacity to perform a reduced range of exertionally light work, including three identified jobs, and that she is therefore not disabled.  Id.  Ms. Magni requested Appeals Council review of the ALJ's September 2014 decision and submitted additional arguments and evidence in support of her claim.  AR 9-10, 406-13, 2177-2216.  On March 29, 2016, the Appeals Council affirmed the ALJ's decision, making it the final decision of the Commissioner.  AR 1-8. Plaintiff then filed this lawsuit.

### C.    Medical Record

#### 1.    Plaintiff's Physical Health History

In August and October 2006, Plaintiff went to the emergency room for headaches, where she was assessed as having a migraine, most likely "pseudotumor cerebri" (also known as a "false tumor" when the pressure inside the skull increases without an obvious reason).  AR 437, 452, 467, 525, 538-40.  In September 2007, Plaintiff again went to the emergency room for migraine headaches, was noted to have recently used methamphetamine, and was diagnosed with

headaches, bipolar disorder, a history of self-mutilation and poor medication compliance.  AR 597, 601.  Between July 2008 and November 2009, Plaintiff was repeatedly treated for severe headaches with history of pseudotumor cerebri.  AR 797-1387.  She received intravenous and oral narcotic and non-narcotic pain medication, as well as sometimes monthly lumbar puncture to remove spinal fluid.  AR 722, 1099, 1130, 1174, 1231, 1336, 1351.  In September 2008, Plaintiff went to the emergency room for chest palpitations and pain and she was given an anti-anxiety medication.  AR 1317-19.  In November, 2008, she had a migraine for ten days with blurred vision in her right eye and tingling on the right side of her face. An MRI of her brain and CT head scan were normal.  AR 1232-33.  She was diagnosed with idiopathic intracranial hypertension, with postural headaches after the lumbar puncture, and was started on OxyContin and referred to the neurology department at UC San Francisco.  AR 1224.

In December 2008, Dr. Leung diagnosed idiopathic intracranial hypertension (pseudotumor cerebri) and severe headaches secondary to that condition.  AR 767.  He recommended another lumbar puncture as well as either an optic nerve sheath fenestration or a ventricular peritoneal shunt as potential alternative treatments for intracranial hypertension, noting that she "will need one of these surgeries" due to her recurrent headaches.  AR 767. However, because Plaintiff was pregnant, conservative medication treatment followed.  AR 776-95, 103-1033, 1115, 1417-1418.  Medical imaging of Plaintiff's brain in November and December 2008 was unremarkable.  AR 1190-91, 1223, 1232.

In January 2009 Plaintiff was treated for headaches, and in February she was hospitalized for a headache.  AR 1004.  In September and November 2009, after giving birth, medical imaging was negative for causes of headache. AR 824, 869.  In February 2010, Plaintiff reported that she had been clean from drugs after an overdose 3 years prior.  AR 1422.  In April 2010, imaging of Plaintiff's spine showed reversal of normal spinal lordosis and impingement in the neck, but no evidence of lumbar spinal pathology.

In May 2010, Plaintiff saw Dr. Cabaluna for a consultative examination.  AR 1442-52. Plaintiff reported severe headaches since 2006, for which she had been diagnosed as having a pseudotumor cerebi and had received spinal taps. AR 1442. She reported that she declined a shunt

3

operation for fear of disrupting care for her children and of the procedure.  AR 1442. Plaintiff reported left side numbness, and admitted she had been addicted to methamphetamine until March 2008.  AR 1442-43.  She reported being able to walk a block, sit but not keep still, and stand for some time, and that her father drove her to the examination but she entered the office unassisted. AR 1443.  Dr. Cabaluna's examination was unremarkable other than obesity.  AR 1443-46. Dr. Cabaluna assessed a history of pseudotumor cerebi with migraine, symptoms of neuropathy in both upper and lower extremities, and bipolar disorder, manic depression, anxiety, agoraphobia, and methamphetamine use.  AR 1446. Dr. Cabaluna opined that Plaintiff could occasionally lift up to 20 pounds and frequently lift up to 10 pounds, and could sit, stand, and walk up to 6 hours in an 8-hour workday with only regular breaks.  AR 1448. Dr. Cabaluna opined that Plaintiff could frequently perform all postural activities other than climbing ladders and scaffolds, which would be limited to occasional.  AR 1448-49.

In July 2010, Plaintiff had nerve root injections in her spine for pain.  AR 1514. In August 2010, Plaintiff was assessed with cervical spinal pain with radiation to the upper extremities, and lumbar pain with radiation to the lower extremities, though an EKG was normal. AR 1472, 1510.  At that time, neurosurgeon Dr. Chopra did not believe surgical intervention was required, and recommended conservative treatment.  AR 1503.  As of October 2010, Plaintiff experienced one episode of visual loss in the right eye lasting about ten seconds, and she believed that her memory was worsening.  AR 1467. The diagnosis was cervical pain from muscular spasms and mild degenerative disc disease, pseudotumor cerebri, a Chiari I malformation, and transient visual loss.  AR 1467. She was referred to an ophthalmologist and was continued on Lamictal, Lexapro, Topamax, and Depakote for her bipolar disorder.  AR 1467-68.  Plaintiff continued to receive cervical injections through March 2011 and pain medication in April 2011. AR 1497, 1499, 1506, 1523.

In September 2011, Plaintiff saw Dr. Fabito for an internal medicine consultative examination.  AR 1587-97. Plaintiff reported that she had driven herself to the examination, and Dr. Fabito noted that "[t]raveling does not bother her."  AR 1587. She reported her issues as migraine headaches, bulging disc in the neck, and low back pain.  AR 1587. Plaintiff reported an

4

United States District Court
Northern District of California

1    inability to raise her arms above her shoulders because of neck pain but did not have difficulty

2    with fine motor manipulation. AR 1589. During the examination, she demonstrated cervical

3    spinal spasm and negative straight-leg-raising, but had no difficulty walking and only mild

4    difficulty walking on toes and heels and squatting and rising. AR 1590. "The rest of the physical

5    examination [was] unremarkable." AR 1590. Dr. Fabito opined that Plaintiff could occasionally

6    lift up to 20 pounds, frequently lift up to 10 pounds, and sit, stand, and walk for up to 6 hours in an

7    average 8-hour workday. AR 1595. Her postural activities were limited to occasional climbing

8    ladders and scaffolds, stooping and bending, and crouching and squatting. AR 1595. He imposed

9    an environmental limitation against vibration due to a neck spasm. AR 1596.

10          In October 2011, Dr. Ghuman opined that Plaintiff's symptoms related to neck and low

11   back pain were stable and he continued medication and physical therapy. AR 1640. In November

12   2011, Plaintiff reported left shoulder pain, and medical imaging showed tendonitis, impingement,

13   mild osteoarthritis, bursitis, cervical spondylosis and disc disease. AR 1641, 1813, 1815-16. In

14   July 2012, Plaintiff was diagnosed with lower back pain possibly associated with arthritis, and

15   cervical spine pain possibly due to disc compromise. AR 1771. Medical imaging showed central

16   canal stenosis (narrowing) in the cervical spine, and normal lumbar spine. AR 1769-70.

17          In August 2012, an individual of unknown qualifications named Gary Manley

18   prepared a RFC Questionnaire in which he found chronic pain syndrome, back pain, and

19   cervicalgia, for which there was no expected improvement and which impacted Plaintiff's ability

20   to perform simple work-related tasks. AR 1760-61. He opined that Plaintiff could walk for one

21   block, sit, stand, and walk for five minutes at a time and zero hours per day, and would need at

22   least six unexpected breaks lasting 30 minutes before Plaintiff could return to work. AR 1760. He

23   opined that Plaintiff could occasionally lift less than ten pounds, had limitations on repetitive

24   reaching, handling, or fingering, and could use her hands only 15 percent of the day. AR 1761.

25   He opined that Plaintiff would be absent from work more than four times per month. AR 1761.

26          In April 2013, Plaintiff saw Dr. Richardson who noted that Plaintiff smoked half a pack of

27   cigarettes per day, lived with her parents, and cared for her children. AR 2160. Dr. Richardson

28   noted that Plaintiff's migraines were not adequately controlled, but that her pseudotumor cerebri

1   was controlled.  AR 2160.  Also in April 2013, Dr. Tse noted that "2 weeks after cervical

2   epidural," Plaintiff had pain improvement and increased range of motion. AR 2158. In September

3   2013, Plaintiff showed mild multilevel degenerative disc disease of the spine, with no evidence of

4   stenosis.  AR 2014-15.  In December 2013, Plaintiff self-reported to Dr. White that she had been

5   admitted to a detox center for Percocet and Soma addiction, but records were not available.  AR

6   2046.

7        In January 2014, Plaintiff was hospitalized for H1N1 influenza related respiratory failure.

8   AR 1932.  She was intubated and placed on ventilation, during which time she experienced a

9   stroke.  AR 1932. She was treated and discharged with narcotic pain medication for chronic back

10  pain and an anti-blood clotting medication.  AR 1933.  She reported no methamphetamine use in

11  10 years. AR 2152.  In February 2014, Plaintiff told Dr. White that the "only sequelae" of the

12  stroke were slight weakness and drooling.  AR 2039.  His physical examination of her was

13  unremarkable.  AR 2040. Plaintiff reported that she had lost her license for driving under the

14  influence of Percocet and Soma, and reported stopping those medications but that she took others.

15  AR 2039. During a visit with Dr. White in March 2014, Plaintiff did not note anything related to

16  left side weakness, and reported that she "feels well."  AR 2035.  However, on March 28, 2014,

17  Plaintiff saw Dr. Kim, a neurology specialist, for evaluation of persistent left-sided numbness

18  following her stroke.  AR 2151-52.  Her main residual symptom was left-sided numbness as well

19  as mildly restricted visual fields, mildly diminished facial sensation, continuous orofacial and

20  hand tardive dyskinesias, and mildly diminished sensation to light touch in the left face, arm, and

21  leg.  AR 2152-53.  Because of a heightened risk for a cardioembolic stroke or a hypercoagulable

22  state, he recommended a cardiac event monitor and that she be continued on Plavix.  AR 2153-54.

23       In July 2014, Dr. White assessed bipolar disorder, anxiety disorder, chronic neck pain,

24  migraines, and stroke, and opined that Plaintiff could not stand, walk, or sit for more than an hour

25  per day, and could never use her left arm.  AR 2175-76.

26              **2.      Plaintiff's Mental Health History**

27       In September 2007, during an emergency room visit, Plaintiff was noted to have recently

28  used methamphetamine, and was diagnosed with headaches, bipolar disorder, a history of self-

United States District Court
Northern District of California

6

1    mutilation and poor medication compliance.  AR 597, 601. Though she had "hesitation wounds,"

2    she did not appear suicidal so she was given medication and discharged.  AR 598. Three days

3    later, she returned to the emergency room after overdosing on medication and cutting herself and

4    was placed on a "5150" psychiatric hold.  AR 609-11.

5         In January 2008, while in treatment for methamphetamine abuse, Plaintiff was hospitalized

6    for cutting herself and diagnosed as having anxiety, headaches, and panic attacks.  A mental status

7    exam revealed slightly impaired concentration and poor memory with an anxious mood and

8    congruent affect (AR 749) and she reported visual hallucinations in the form of seeing shadows

9    (AR 749).  She was discharged as stable.  AR 744-751.  She missed an appointment

10   set for January 31, 2008 because she was in emergency care for cutting herself, and then in a two-

11   week residential program.  AR 744.

12        After Plaintiff's alleged disability onset date of February 1, 2008, she graduated from a 12-

13   step recovery program but then reported a relapse and rape while under the influence.  AR 728,

14   724, 742.  She reported doing "worse" after having been hospitalized and a change of medications

15   and engaged in bulimic behavior.  AR 727.  In March 2008, Plaintiff was diagnosed with bipolar

16   disorder with mixed psychosis and reported a methamphetamine relapse.  AR 711, 724; see also

17   AR 743 (Plaintiff was "in and out of crisis").  As of April 23, 2008, she was in another residential

18   program, and had abstained from drugs for almost 30 days. AR 723. In June 2008, she reported a

19   "slight increase" in her depression.  AR 716.  In August 2008 she was diagnosed with bipolar

20   disorder, mixed, severe, without psychotic features.  AR 711-13.

21        On February 2, 2010, Plaintiff saw psychiatrist Dr. Fayazi for evaluation of anxiety and

22   mania.  AR 1422-24. She reported a history of drug addiction,10 overdoses and suicide attempts,

23   and six drug detoxes.  AR 1422.  She had been taking narcotic pain medications for headaches due

24   to her pseudotumor cerebri for the preceding year, but had recently been given methadone and was

25   tapered off of the narcotics.  AR 1422.  She stopped taking the narcotics and was experiencing a

26   depressed mood, racing thoughts, severe mood swings, difficulty sleeping, irritability, agitation,

27   anxiety, and low energy. AR 1422.  A mental status examination showed an anxious mood, recall

28   of only one of three words after a five-minute delay, and fair judgment, insight, and impulse

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1   control. AR 1423.  She was assessed with mood disorder, bipolar disorder, and opiate dependence

2   in remission.  AR 1424.

3        In April 2010, Dr. Roldan, a State agency reviewing physician, prepared a Psychiatric

4   Review Technique form that assessed severe affective and substance addiction disorders not

5   expected to last 12 months. AR 1428. Dr. Roldan assessed mild limitations in all functional areas.

6   AR 1438.

7        Plaintiff  saw Dr. Zedek in February 2011 and requested a voluntary hospitalization related

8   to drug use and suicidal ideation.  AR 1536-39. She had recently been obtaining her psychiatric

9   medications from her primary care provider but felt that she had been "deteriorating" and wanted

10  to check into a psychiatric hospital.  AR 1539. She had passive suicidal ideation with no intention

11  or plan and was feeling "really miserable," with uncontrolled moods and increasing depression.

12  AR 1536, 39. Dr. Zedek's diagnosis was panic disorder without agoraphobia and bipolar disorder,

13  mixed, without psychotic features.  AR 1536. He agreed with Ms. Magni and her mother that

14  psychiatric hospitalization was indicated, although an ambulance was not necessary.  AR 1536 .

15       In April 2011, Plaintiff was assessed as having panic disorder with agoraphobia and

16  bipolar disorder.  AR 1553.   In October 2011, Dr. Roldan prepared another Psychiatric Review

17  Technique form, and assessed affective and anxiety-related disorders, including bipolar disorder

18  and panic disorder, which resulted in mild restriction on activities of daily living and maintaining

19  social functioning, and moderate restriction on maintaining concentration, persistence, and pace.

20  AR 1598-1611.  Dr. Roldan opined that Plaintiff had the capacity to understand, remember, and

21  carry out simple and one-to-two step instructions on a sustained basis in a normal work

22  environment.  AR 1614.

23       Also in October 2011, treating psychiatrist Dr. Zedek prepared a Mental Capacity

24  Assessment in which he opined that Plaintiff had extreme limitations in remembering locations

25  and work-like procedures, and marked limitations in understanding and remembering short or

26  detailed instructions.  AR 1623. He assessed extreme limitations in ability to carry out short and

27  simple instructions and perform activities within a schedule, working in coordination or proximity

28  to others, make simple work-related decisions, and a marked ability to carry out detailed

8

instructions, maintain attention for extended periods, sustain ordinary routine without special supervision, complete a normal workday or workweek without interruptions from psychological symptoms, and perform at a consistent pace.  AR 1623-24. He opined that Plaintiff would have more than four absences per month.  AR 1624. Dr. Zedek further opined that Plaintiff would have extreme limitations in ability to interact with the public, ask simple questions or request assistance, get along with coworkers without distracting them, and marked limitations in ability to accept instructions and maintain socially acceptable behavior and standards of neatness and cleanliness.  AR 1624. Dr. Zedek opined that Plaintiff would have extreme limitations in ability to respond to changes in the workplace, travel in unfamiliar locations or use public transportation, or set realistic goals independently, and marked limitations in ability to be aware of normal hazards. AR 1625.

Between June 2011 and July 2012, Plaintiff received counseling for relationship issues. AR 1686-1754.  In October 2011, Plaintiff reported to a nurse that medication was helping her. AR 1629.  In July 2012, Dr. Zedek noted mild mood swings and panic attacks and monitored Plaintiff's medication.  AR 1677.  In August 2012, Dr. Zedek prepared a Mental Capacity Assessment in which he assessed extreme limitations in ability to understand and remember detailed instruction, maintain attention for extended periods, complete a normal workday without interruptions from psychological symptoms, ask simple instructions, accept instructions and respond to criticism, and travel in unfamiliar places or use public transportation, and marked limitations in all other areas.  AR 1755-56.

In February 2013, Plaintiff cut herself to relieve pain after running out of Percocet and morphine early, but denied suicidal intent and received pain and antianxiety medication. AR 2162-63.  She was reported to be disheveled, with missing front teeth, tattoos, and numerous superficial lacerations to her left forearm; restless, fidgety, with mildly pressured speech; an anxious, labile, and easily tearful mood; with poor judgment and insight.  AR 2162. She was determined to be a high risk for self-harm in light of her psychic distress, chronic physical pain, access to pills, and conflict with her social support, with no place to live in light of parents having put her out of their house.  AR 2163. She was diagnosed with mood disorder and polysubstance dependence, with a

9

current GAF of 25.  AR 2163-64. She was stabilized on Norco, Klonopin, Ativan,Topamax, Geodon, and Trazodone and discharged.  AR 2165.

Between April and June 2014, Plaintiff was assessed with post-traumatic stress disorder and bipolar disorder.  AR 2169-73.  At that time, Plaintiff's most severe symptoms were frequent panic attacks, and she reported no side effects from medication.  AR 2169-70.  She was assessed with a marked limitation on her ability to perform activities on a schedule, complete a workday with interruption from psychological symptoms, interact with the public, respond to criticism from supervisors, or travel to unfamiliar places.  AR 2172.  She was assessed with moderate-to-marked limitations in her ability to make simple work-related decisions, ask simple questions, get along with peers without distracting them, respond appropriately to workplace changes, and make plans independently.  AR 2172.  Other functional areas were marked as unknown or unlimited.  AR 2172.

In April 2014, after the ALJ hearing, Plaintiff saw Dr. Penney for planned weekly psychotherapy.  AR  2177-79. Plaintiff reported anxiety and that she spent her day lying down. AR 2181. Dr. Penney noted that Plaintiff qualified for a diagnosis of post-traumatic stress disorder and experienced four panic attacks per day without any obvious trigger.  AR 2181, 2184.

**B.     ALJ Hearing**

      **1.     Plaintiff's Testimony**

During the ALJ hearing, Plaintiff testified that she has previously lived with both her boyfriend and her parents.  AR 67, 97.  She has two children (a toddler and a teenager), and Plaintiff's parents (and at times their father) are their primary caregivers.  AR 97-98. She has difficulty caring for her kids due to her impaired memory and her fear of leaving the house.  AR 98.  She is capable of driving, but finds it difficult and drives herself to the doctor if she has no other option.  AR 52, 99-100. Her social interactions are generally limited to her son and her boyfriend, and she tends to leave the house only for medical appointments.  AR 60.  Her boyfriend reminds her to do things in light of her impaired memory and concentration.  AR 60. She dresses herself but has difficulty getting into the shower and doing her hair.  AR 66. Her boyfriend cooks and cleans. AR 66.

United States District Court
Northern District of California

Plaintiff testified that she has been diagnosed with bipolar disorder and anxiety.  AR 55-56.  Her anxiety causes panic attacks, mostly when she leaves the house or is around other people.  AR 56-57.  She has also been diagnosed with attention deficit and hyperactivity disorder, and can usually concentrate for no longer than about 15 minutes at a time.  AR 57-59.  She experiences suicidal ideation and has been hospitalized for a 72-hour hold.  AR 59.  She also underwent emergency treatment in January 2008 for cutting herself.  AR 96, 104.  At the time of the ALJ hearing, she attended counseling twice a week and was on Geodon, Trazodone, and Clonazepam.  AR 57-58.  Therapy helped her symptoms "somewhat," and her medications help "a little bit."  AR 58.  Plaintiff previously abused methamphetamine but last used illegal drugs either in around 2007 (AR 66) or 2004 (AR 96).

Plaintiff further testified that she has physical symptoms that interfere with her physical functioning as follows:  She has lower back and neck pain radiating into her arms and legs that is "pretty constant."  AR 61.  She takes pain medications and has received nerve block injections to ameliorate the symptoms, but the medications help "a little bit" and the injections are ineffective.  AR 61.  The medications make her tired.  AR 62, 103-04.  Because of her back pain, she claims that she has difficulty sitting more than five minutes or standing more than 10 minutes and can walk for about five minutes.  AR 64.  She lies down 90 percent of the day.  AR 65.  She can lift and carry about five pounds and has difficulty grasping, but can perform fine manipulations, such as buttoning buttons or zipping zippers.  AR 64-65.

Plaintiff has a pseudotumor and "Chiari malformation" which has been drained.  AR 62.  She experiences headaches every other day, for which she takes Topamax which helps "a little."  AR 63, 100.  She has had lumbar puncture therapy to address the headaches, but did not continue with that because she had "too much scar tissue." AR 100.  Plaintiff suffered a stroke in January 2014.  AR 106.  She speaks with a slight lisp or slur and has weakness on the left side of her body and drools out the left side of her mouth.  AR 106.

### 2.    Dr. Levy's Testimony

During the ALJ hearing, non-examining psychologist Dr. Arthur Lewy testified based on a review of the records that Plaintiff had the severe impairments of depression and anxiety which

did not meet or equal a Listing.  AR 80-81. Dr. Lewy testified that Plaintiff would have the residual functional capacity ("RFC") to handle "work that was basic in nature, as well as some work that would involve some more familiar detailed tasks that could be done at a steady pace," with some public contacts, regular supervision, and reasonably predictable work routines.  AR 81. He opined that Plaintiff would have mild limitation in activities of daily living, and moderate limitations in social function and maintaining concentration, persistence, and pace, and one possible episode of decompensation.  AR 89. Dr. Lewy noted that Plaintiff was hospitalized for cutting herself the day before the alleged onset date, but that the record did not establish this "was more than a transient event for her," and was likely related to methamphetamine treatment. AR 82-83.  When asked about a Global Assessment of Functioning ("GAF") score of 37 in August 2008, Dr. Lewy testified that it is "always hard to know what to do with GAF scores," and that there was not "the kind of treatment nor signs or symptoms that one would – that I would expect for someone with such a low GAF score," and that it was unusual to see such a low GAF score in an outpatient setting.  AR 84.

Dr. Lewy testified that there was "some discrepancy" related to Plaintiff's agoraphobia, because it was described as part of a consultative examination (presumably Dr. Fabito's examination) when Plaintiff had driven herself to the examination which was perhaps in "an unfamiliar location, sitting with an unfamiliar person," and Dr. Lewy therefore concluded that "it sounds like she can go out some."  AR 86.  Though he did not consider headaches to be a mental impairment, they could affect stress levels and he considered them in evaluating her functional capacity.  AR 88-89.

### 3. Vocational Expert

A vocational expert testified that Plaintiff had past relevant work as a mortgage clerk, checker, data entry clerk, and receptionist/bookkeeper.  AR 109.  The ALJ presented the vocational expert with the hypothetical of someone with Plaintiff's vocational background, capable of lifting and carrying 10 pounds occasionally and less than 10 pounds frequently, sitting, standing, and walking for 6 out of 8 hours, required to perform work that was basic in nature but familiar detailed work, at a steady pace, with cursory contact with the public, and able to manage

United States District Court
Northern District of California

12

reasonably predictable work routines and supervision but not more.  AR 110-11. The vocational expert testified that such a claimant could not perform past relevant work, but there would be other work available in the economy.  AR 111.  If the hypothetical included a marked limitation on ability to complete a normal workday without interruption from psychologically based symptoms, then jobs would not be available and the person would be rendered unemployable.  AR 113-114.  Similarly, if someone would be absent four or more days per month, that person would not be employable.  AR 114.

### D.    ALJ Decision

The ALJ held a hearing on remand on June 9, 2014, and then issued a decision on September 22, 2014.  At step one, the ALJ found that Plaintiff was insured for Title II benefits only through December 31, 2012, and had not engaged in substantial gainful activity after her alleged onset date of February 2008.  AR 16-17.  At step two, the ALJ found that Plaintiff had severe impairments of depressive disorder, anxiety disorder, degenerative disc disease, tendonitis of the left shoulder, history of pseudotumor cerebi and headaches.  AR 17.  The ALJ noted that "there is some indication in the record that Plaintiff is status post ischemic stroke, affecting the partial left lobe," but that Plaintiff "reported to her physician that the only residuals are slight weakness and drooling" so the condition was not a severe impairment within the meaning of the regulations.  AR 17.  At step three, the ALJ concluded that none of Plaintiff's impairments were presumptively disabling under the listings.  AR 17-19.  The ALJ concluded that Plaintiff has mild restriction in activities of daily living, moderate restriction in social functioning, and moderate restriction in concentration, persistence, and pace, and had experienced one to two episodes of decompensation.  AR 19.

At step four, the ALJ assessed Plaintiff as having the RFC to perform a limited range of light work, limited to lifting and carrying 10 pounds occasionally and less than 10 pounds frequently; sitting/ standing/ walking for six hours out of an eight-hour day, performing "tasks that are basic in nature, as well as more familiar detailed tasks at a steady pace, with cursory contact with the public," and managing reasonably predictable work routines with routine supervision.  AR 19.  Based on the testimony of a vocational expert, at step five the ALJ found that Plaintiff

1    could not perform past relevant work, but could perform other work available in the national

2    economy.  AR 24-25. Therefore, the ALJ found that Plaintiff is not disabled. AR 26.

3    **II.      LEGAL STANDARD**

4            **A.  Standard of Review**

5            Pursuant to 42 U.S.C. § 405(g), the Court's jurisdiction is limited to determining whether

6    the findings of fact in the ALJ's decision are supported by substantial evidence or were premised

7    on legal error.  42 U.S.C. § 405(g); see Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).

8    Substantial evidence is defined as relevant evidence that a reasonable person might accept as

9    adequate in support of a conclusion; it is "more than a mere scintilla but less than a

10   preponderance." Id.; see also Richardson v. Perales, 402 U.S. 389, 401 (1971); Sandgathe v.

11   Chater, 108 F.3d 978, 980 (9th Cir.1997).  Reasoning not relied upon by the ALJ cannot be relied

12   upon to affirm the ALJ's decision.  See Cequerra v. Sec'y, 933 F.2d 735, 738 (9th Cir. 1991)

13   ("[O]nly . . . the grounds articulated by the agency" may be considered).

14           To determine whether the ALJ's decision is supported by substantial evidence, courts

15   review the administrative record as a whole, weighing both the evidence that supports and detracts

16   from the ALJ's decision.  Sandgathe, 108 F.3d at 980 (quoting Andrews v. Shalala, 53 F.3d 1035,

17   1039 (9th Cir. 1995.)  If the evidence is susceptible to more than one rational interpretation, the

18   Court must uphold the ALJ's conclusion.  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

19   The trier of fact, not the reviewing court, must resolve conflicting evidence, and if the evidence

20   can support either outcome, the reviewing court may not substitute its judgment for the judgment

21   of the ALJ.  Id.; see also Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir.1992).  An ALJ's

22   decision will not be reversed for harmless error.  Id.; see also Curry v. Sullivan, 925 F.2d 1127,

23   1131 (9th Cir. 1991).

24           **B.      Definition and Determination of Disability**

25           In order to qualify for disability insurance benefits, a plaintiff must demonstrate an

26   "inability to engage in any substantial gainful activity by reason of any medically determinable

27   physical or mental impairment which can be expected to result in death or which has lasted or can

28   be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

United States District Court
Northern District of California

14

1    The Social Security Administration ("SSA") utilizes a five-step sequential evaluation process in

2    making a determination of disability.  20 C.F.R. § 404.1520; see Reddick, 157 F.3d 715, 721.  If

3    the SSA finds that the claimant is either disabled or not disabled at a step, then the SSA makes the

4    determination and does not go on to the next step; if the determination cannot be made, then the

5    SSA moves on to the next step.  20 C.F.R. § 404.1520.

6         First, the SSA looks to the claimant's work activity, if any; if the claimant is engaging in

7    substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(a)(4)(I).  Second, the SSA

8    considers the severity of impairments; the claimant must show that he has a severe medically

9    determinable physical or mental impairment (or combination of severe impairments) which has

10   which has lasted or is expected to last twelve months or end in death.  20 C.F.R. §

11   404.1520(a)(4)(ii).  Third, the SSA considers whether a claimant's impairments meet or equal a

12   listing in 20 C.F.R. Part 404 Appendix 1.  If so, the claimant is deemed disabled.  20 C.F.R. §

13   404.1520(a)(4)(iii).  Fourth, the SSA considers the claimant's residual functional capacity

14   ("RFC") and past relevant work.  If the claimant can still engage in past relevant work, he is not

15   disabled.  20 C.F.R. § 404.1520(a)(4)(iv).  Fifth, the SSA considers whether, in light of the

16   claimant's RFC and age, education, and work experience, the claimant is able to make an

17   adjustment to another occupation in the national economy; if so, the claimant is not disabled.  20

18   C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 404.1560(c).  The claimant bears the burden on steps one

19   through four.  Reddick, 157 F.3d at 721.  If a claimant establishes an inability to perform her prior

20   work at step four, the burden shifts to the SSA to show that the claimant can perform other

21   substantial work that exists in the national economy at step five.  Id.

## III.    DISCUSSION

### A.    ALJ's Consideration of Evidence Relating to Plaintiff's Stroke

24        "At step two of the five-step sequential inquiry, the Commissioner determines whether the

25   claimant has a medically severe impairment or combination of impairments."  Smolen v. Chater,

26   80 F.3d 1273, 1289-90 (9th Cir. 1996). "The Social Security Regulations and Rulings, as well as

27   case law applying them, discuss the step two severity determination in terms of what is 'not

28   severe.' According to the Commissioner's regulations, 'an impairment is not severe if it does not

United States District Court
Northern District of California

significantly limit [the claimant's] physical ability to do basic work activities.'" Id. at 1290. At step two, "the ALJ must consider the combined effect of all of the claimant's impairments on [his or] her ability to function, without regard to whether each alone was sufficiently severe. . . . Also, [the ALJ] is required to consider the claimant's subjective symptoms, such as pain or fatigue, in determining severity." Id. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims . . . . An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individuals' ability to work.'" Id. (quoting SSR 85-28).

In the opinion, at step 2 the ALJ noted that "there is some indication in the record that Plaintiff is status post ischemic stroke, affecting the partial left lobe," but that Plaintiff "reported to her physician that the only residuals are slight weakness and drooling" so the condition was not a "severe" impairment within the meaning of the regulations.  AR 17.  Because of this conclusion, the ALJ did not include any specific symptoms of the stroke within her evaluation of Plaintiff's RFC at step 4.

Plaintiff argues that the ALJ committed reversible error when she found that Plaintiff's stroke was not a legally severe impairment at step 2 and imposed no specific functional limitation relating to the stroke at step 4.  She contends that her self-report to Dr. White that her symptoms included weakness and drooling does not imply a non-severe or non-functionally limiting condition.  See AR 2039.  Instead, Plaintiff points out that, far from minimal, these symptoms prompted her to visit vascular neurologist Dr. Kim who confirmed her reported symptoms.  AR 2151-53.  She also points to evidence of persistent left-side weakness (AR 2152-53, 2039) as well as Dr. White's ultimate conclusion -- based in part on the evaluation by Dr. Kim -- that her pain and stroke totally precluded her from regular engagement in fine or gross manipulations with her left hand or arm.  AR 2175-76.  As there is no evidence in the record to contradict Dr. White's treating opinion as to the symptoms and limitations associated with her stroke, Plaintiff argues that the ALJ committed error in substituting her own opinion for that of Dr. White.

The Commissioner counters that Plaintiff's self-report of weakness and drooling to Dr. White do not show any limitations on her ability to work or that it met the duration requirement.

1    Likewise, the Commissioner contends that Dr. Kim's assessment of the symptoms of Plaintiff's

2    stroke do not reflect limitations on her ability to work that would go beyond the ALJ's RFC

3    assessment.  Therefore, according to the Commissioner, the ALJ was right not to consider the

4    stroke a severe impairment.  The Commissioner also argues that even if the ALJ erred in not

5    considering Plaintiff's stroke to be a severe limitation at step two, this error was harmless because

6    the ALJ found other severe impairments and thus proceeded with the analysis beyond step two.

7    See Burch v. Barnhart, 400 F.3d 676, 683 (9th Cir. 2005).

8         Plaintiff is correct that the medical record does not contain anything to contradict Dr.

9    White's assessment of the symptoms or functional limitations imposed by the stroke.  While the

10   ALJ may disagree with Dr. White's assessment, without some medical evidence to support her

11   conclusion, the ALJ was not free to substitute her own opinion for that of a treating doctor and

12   doing so was in error.  See, e.g., Tackett v. Apfel,180 F.3d 1094, 1102 (9th Cir. 1999)

13   (inappropriate and erroneous for ALJ to interject own opinion and render a medical judgment as to

14   what treatment should have been provided to the claimant and substitute his own medical

15   judgment for that of a treating physician); Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir.

16   1975) (an ALJ is forbidden from making his own medical assessment beyond that demonstrated

17   by the record).

18        The ALJ's error was not harmless because it was carried over from step two to the RFC

19   assessment at step four.  With respect to the ALJ's RFC assessment, the Commissioner argues that

20   the ALJ correctly found no support for Dr. White's conclusion that Plaintiff was totally precluded

21   from fingering or reaching on the left side, when that conclusion was based on Plaintiff's self-

22   report of a slight weakness on her left side.  AR 2039, 2175-76.  The Commissioner points out that

23   at Plaintiff's next visit to Dr. White, she did not mention weakness on her left side.  AR 2031.

24   However, there is no medical evidence to the contrary on which to base the ALJ's rejection of Dr.

25   White's opinion as to the impact of Plaintiff's stroke on her RFC.  This constitutes reversible

26   error.

27        The parties agree that, in light of the fact that Plaintiff's stroke occurred after the

28   December 31, 2012 expiration of Plaintiff's disability insurance under Title II, evidence and

1    argument relating to her stroke are only relevant to her claim for social security benefits under

2    Title XVI.  Therefore, on remand the Court's conclusion on this issue only impacts Plaintiff's

3    potential right to Title XVI social security benefits.

**B.      ALJ's Consideration of the Physical Function Limitations Assessed By Dr. White**

6         Plaintiff also argues that the ALJ committed reversible error at step four by rejecting the

7    opinion of treating physician Dr. White as to Plaintiff's overall physical functional limitations.

8    The ALJ rejected Dr. White's opinion that Plaintiff could not stand, walk, or sit for more than an

9    hour per day, and could never use her left arm on the basis that the ALJ could "find no support for

10   these extreme limitations in the record."  AR 23.  Plaintiff argues that this single, vague statement

11   does not amount to "clear and convincing reasons that are supported by substantial evidence" for

12   rejecting the opinion of a treating physician.  See Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th

13   Cir. 2005); see also Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) (where

14   treating physician's opinion is contradicted by other substantial evidence in the record, the ALJ

15   must still provide "specific and legitimate reasons that are supported by substantial evidence");

16   Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).[1]

17        However, Plaintiff acknowledges that, in addition to Dr. White, state examining doctors

18   Dr. Cabaluna and Dr. Fabito also assessed Plaintiff's functional limitations stemming from her

19   physical medical issues (prior to her stroke) but found her limitations to be less restrictive.

20   Compare AR 2175-76 to AR 1448-49 and AR 1595.  Given this conflict between the opinion of

21   treating physician Dr. White and the opinions of examining physicians Dr. Cabaluna and Dr.

22   Fabito, the ALJ was required to provide "specific and legitimate reasons" for rejecting Dr. White's

23   opinion.  In rejecting Dr. White's opinion, the ALJ simply stated that she "f[ou]nd no support for

24   these extreme limitations in the record."  AR 23.  Plaintiff argues that the ALJ's explanation for

25   rejecting Dr. White's opinion is insufficient and vague.  See, e. g., Gutierrez v. Colvin, Case No.

---

[1] The Commissioner disputes the Ninth Circuit's application of the "clear and convincing" standard to the review of an ALJ's decision to discredit an uncontradicted medical source opinion., but acknowledges that this Court is bound to follow this Ninth Circuit law.  See Cross-Motion at 15 n.3.

United States District Court
Northern District of California

2:15-cv-07421-E (C.D. Cal. May 12, 2016) (citing Kinzer v. Colvin, 567 Fed. App'x 529, 530 (9th Cir. 2014) (ALJ's statements that treating physicians' opinions "contrasted sharply with the other evidence of record" and were "not well supported by the . . . other objective findings in the case record" held to be insufficient)); see also Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988) ("[t]o say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required, even when the objective factors are listed *seriatim*. The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct"); McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989) ("broad and vague" reasons for rejecting a treating physician's opinions insufficient).

The Commissioner counters that the ALJ properly relied on the opinions of Drs. Cabaluna and Fabito as substantial evidence to contradict Dr. White's opinion. See Orn v. Asture, 495 F.3d 625, 632 (9th Cir. 2007) (when examining physician provides "independent clinical findings that differ from the findings of the treating physician," such findings can be "substantial evidence"). Plaintiff correctly responds that the contradiction between Dr. White's opinion and that of Doctors Cabaluna and Fabito serves only to define the evidentiary standard required to reject the opinion of a treating physician ("specific and legitimate" reasons must be articulated), and the contradiction is not alone a sufficient reason to reject Dr. White's opinion. See Valentine v. Commissioner, 574 F.3d 685, 692 (9th Cir. 2009) ("to reject the opinion of a treating physician 'in favor of a conflicting opinion of an examining physician[,]' an ALJ still must 'make [ ] findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record'"). The ALJ did not provide any specific rationale for rejecting Dr. White's opinion beyond that she could "find no support for these extreme limitations in the record." This is an insufficient explanation.

Plaintiff also argues that the ALJ's rejection of Dr. White's opinion of her limitations is erroneous in light of the extensive medical record not only showing Plaintiff's left-sided symptoms following her stroke, but also repeated treatments including invasive procedures such as

United States District Court
Northern District of California

1   spinal taps for recurrent headaches and ongoing injections and nerve blocks for persistent

2   debilitating neck pain.  See, e.g., AR 467, 1224, 766, 767, 770-72, 812, 1176, 1496-97, 1499-

3   1500, 1512, 1514-15, 1521, 1523-24, 1526, 1571, 1569, 1566, 2152-52.

4        The Commissioner counters that the ALJ did not entirely disregard Plaintiff's pain

5   symptoms, and in fact reduced the RFC assessment beyond the limitations imposed by Dr.

6   Cabaluna and Dr. Fabito to limit her to lifting no more than 10 pounds.  See AR 24.  Moreover,

7   the Commissioner argues that the ALJ summarized the medical record and did not find anything to

8   support Dr. White's extreme limitations.  The Commissioner points to the ALJ's statements in

9   another portion of the opinion that "medical imaging showed no intracranial pathology" (AR 20,

10  citing AR 824), and that while Plaintiff received care for neck and back pain, medical imaging was

11  minimal and Dr. Chopra did not believe there was any pathology for which surgical intervention

12  was required and recommended conservative treatment (AR 20, citing AR 1503).  The

13  Commissioner also points out that as late as September 2013, medical imaging showed only mild

14  multilevel degenerative disc disease.  See AR 2014-15.  According to the Commissioner, all of

15  this amounts to specific and legitimate reasons that are supported by substantial evidence to reject

16  Dr. White's conclusions.

17       However, even if these reasons were otherwise persuasive, the ALJ did not actually rely on

18  them to reject Dr. White's opinion of Plaintiff's functional limitations in this part of the opinion.

19  See AR 23.  Therefore, the decision cannot be affirmed on these unstated bases now.  See, e.g.,

20  Bray v. Astrue, 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative

21  law require us to review the ALJ's decision based on the reasoning and factual findings offered by

22  the ALJ--not post hoc rationalizations that attempt to intuit what the adjudicator may have been

23  thinking."); Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007) ("We review only the reasons

24  provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon

25  which he did not rely.").  The ALJ committed reversible error in this aspect of the opinion as well.

26

27       **C.   ALJ's Consideration of Mental Functional Limitations Assessed By Dr.
          Zedek**

28  Plaintiff argues that the ALJ erred by giving little or no weight to treating psychiatrist Dr.

United States District Court
Northern District of California

1    Zedek's assessment of her mental functional limitations stemming from her psychiatric

2    impairments.  As described above, in October 2011, Dr. Zedek prepared a Mental Capacity

3    Assessment in which he opined that Plaintiff had extreme limitations in remembering locations

4    and work-like procedures, and marked limitations in understanding and remembering short or

5    detailed instructions.  AR 1623.  He assessed extreme limitations in Plaintiff's ability to carry out

6    simple instructions and perform activities within a schedule, work in coordination or proximity to

7    others, make simple work-related decisions, and a marked ability to carry out detailed instructions,

8    maintain attention for extended periods, sustain ordinary routine without special supervision,

9    complete a normal workday or workweek without interruptions from psychological symptoms,

10    and perform at a consistent pace.  AR 1623-24.  He opined that Plaintiff would have more than

11    four absences per month, and would have extreme limitations in ability to interact with the public,

12    ask simple questions or request assistance, get along with coworkers without distracting them, and

13    marked limitations in ability to accept instructions and maintain socially acceptable behavior and

14    standards of neatness and cleanliness.  AR 1624.  Dr. Zedek opined that Plaintiff would have

15    extreme limitations in ability to respond to changes in the workplace, travel in unfamiliar locations

16    or use public transportation, or set realistic goals independently, and marked limitations in her

17    ability to be aware of normal hazards.  AR 1625.  In August 2012, Dr. Zedek prepared a similar

18    assessment in which he assessed extreme limitations in her ability to understand and remember

19    detailed instructions, maintain attention for extended periods, complete a normal workday without

20    interruptions from psychological symptoms, ask simple instructions, accept instructions and

21    respond to criticism, and travel in unfamiliar places or use public transportation, and marked

22    limitations in other areas.  AR 1755-56.

23        The only reason given by the ALJ for rejecting Dr. Zedek's opinion of Plaintiff's mental

24    functional capacity was that Dr. Zedek's treatment notes reflected "mild symptoms and mostly

25    mental status within normal limits" that "primarily summarize subjective complaints, diagnoses,

26    and treatment, but do not provide objective clinical or diagnostic findings."  AR 22.  Plaintiff

27    argues that this mischaracterizes the treatment notes and other evidence in the record, which

28    reflect a long history of suicidal and other self-destructive behavior such as cutting, voluntary and

United States District Court
Northern District of California

1    involuntary hospitalizations, multiple psychiatric medications, very low GAF scores, and

2    diagnoses of bipolar and panic disorder, depression and anxiety.  See, e.g., AR 598, 601, 609-11,

3    711-16, 723, 727, 743-44, 749, 751, 1317-19, 1422-24,1536-39, 1684-85, 2162-65; but see AR

4    1677 (in July 2012 Dr. Zedek found only mild mood swings and panic attacks).

5            In contrast to Dr. Zedek's opinion, the ALJ relied on the testimony of reviewing physician

6    Dr. Lewy, who found Plaintiff's limitations to be less severe.  See AR 80-91.  Dr. Lewy's opinion,

7    based only on a review of the records and without any evaluation of Plaintiff, does not amount to

8    "substantial evidence" that could support the ALJ's finding without some other corroborating

9    evidence.  See Pitzer v. Sullivan, 908 F.2d 502, 506 n.4 (9th Cir. 1990) ("[t]he nonexamining

10   physician's conclusion, with nothing more, does not constitute substantial evidence, particularly in

11   view of the conflicting observations, opinions, and conclusions of an examining physician").

12   Absent any substantial evidence supporting Dr. Lewy's opinion or contradicting that of Dr. Zedek,

13   the ALJ was not free to reject Dr. Zedek's opinion without articulating a "clear and convincing"

14   reason.  See Bayliss, 427 F.3d at 1216.

15           The Commissioner argues that, in addition to Dr. Lewy's testimony, elsewhere in the

16   opinion the ALJ cited mental status examinations between February 2008 and July 2012 as

17   unremarkable and within normal limits.  See AR 22, citing AR 716 (June 2008, overall stable with

18   "slight increase" in depression and good medication adherence and response), AR 723-25 (April

19   2008, unremarkable with good medication adherence and response), AR 727 (February 2008, did

20   worse after last appointment, medication changed, examination unremarkable), AR 1420

21   (February to March 2010, medication adjustment), AR 1423 (February 2010, anxious mood but

22   otherwise unremarkable), AR 1677-78 (July 2012, Dr. Zedek, mild mood swings and irritability

23   and mild panic attacks, unremarkable  examination), AR 1687 (July 2012, more alert, mood better,

24   "told us she had been doing better"), AR 1689-93 (June 2012, cooperative and talkative but

25   groggy having recently awoken), AR 1695 (May 2012, unremarkable mental status examination

26   terminated due to physical pain), AR 1701 (April 2012, unremarkable examination and Plaintiff

27   was happy to see staff), AR 1708 (March 2012, unremarkable examination), AR 1719-21 (January

28   2012, unremarkable examination, happy to see staff).  According to the Commissioner, this

evidence is consistent with and supports Dr. Lewy's testimony and amounts to substantial evidence to support the ALJ's rejection of Dr. Zedek's treating opinion.  The Commissioner points out that the ALJ's RFC assessment did take into account Plaintiff's depressive and anxiety disorders, and simply found that she did not have such marked or extreme limitations in the functioning areas as opined by Dr. Zebek.

While a close question, the Court finds that the ALJ committed error in her consideration of Dr. Zedek's assessment.  The only reason given by the ALJ for rejecting Dr. Zedek's opinion is his treatment notes.  However, those notes do not contradict his ultimate conclusion as to Plaintiff's functional limitations.  While some of the medical evidence might be interpreted as reflecting less than marked limitations in mental functioning, the ALJ did not refer to this evidence to support her decision not to adopt the mental limitations assessed by treating physician Dr. Zedek. Therefore, the decision cannot be affirmed on this basis now.  See, e.g., Bray v. Astrue, 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ--not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking."); Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007) ("We review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely.").  The ALJ also committed reversible error in this aspect of the opinion.

**D.     ALJ's Credibility Determination**

In deciding whether to admit a claimant's subjective complaints, ALJs engage in a two-step analysis.  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1196 (9th Cir. 2004) (citing Smolen v. Chater, 80 F.3d 1273,1281 (9th Cir. 1996)). First, "the claimant must produce objective medical evidence of underlying 'impairment,' and must show that the impairment, or a combination of impairments, 'could reasonably be expected to produce pain or other symptoms.'" Id. (quoting Smolen, 80 F.3d at 1281- 82).  If the first step is satisfied, then the ALJ may consider whether the claimant's statements about the intensity, persistence, and limiting effects of those symptoms are credible and consistent with objective medical evidence. Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007); 20 C.F.R. § 416.929(c). If an ALJ discredits a claimant's

United States District Court
Northern District of California

1   subjective symptom testimony, the ALJ must provide "specific, clear and convincing reasons for

2   doing so."  Brown-Hunter v. Colvin, 806 F.3d 487, 492-93 (9th Cir. 2015) (citation omitted). "A

3   finding that a claimant's testimony is not credible must be sufficiently specific to allow a

4   reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible

5   grounds and did not arbitrarily discredit a claimant's testimony regarding pain."  Id. at 493

6   (citation omitted).  "General findings are insufficient; rather, the ALJ must identify what

7   testimony is not credible and what evidence undermines the claimant's complaints." Id. (citation

8   omitted).  That evidence cannot consist merely of "the medical evidence supporting [the ALJ's]

9   RFC determination."  Id. at 494.

10         After summarizing Plaintiff's statements as to her limitations, the ALJ found that

11   "claimaint's allegations are not adequately supported by the medical evidence summarized

12   above." AR 23-24.  The ALJ also noted that Plaintiff's credibility was called into question by

13   inconsistent statements she made about her history of drug abuse by at one time reporting that she

14   had not used drugs since 2007, and another time stating she relapsed in 2008.  AR 24; see also

15   724, 1420.  The ALJ also found some inconsistency with respect to Plaintiff's reports of

16   agoraphobia and driving, because she stated that she did not go outside but also stated that she

17   sometimes drove, and failed to mention that for a period she lost her license due to a DUI.  AR 24.

18         The ALJ erred in finding her subjective symptoms not entirely credible because the ALJ

19   failed to identify how any medical evidence conflicts with Plaintiff's reported symptoms.  See

20   Treichler, 775 F.3d at 1103 (citing Vasquez v. Astrue, 572 F.3d 586, 592 (9th Cir. 2008)) (ALJ's

21   "vague allegation" that a claimant's testimony is "not consistent with the objective medical

22   evidence," without specific findings in support of that conclusion was "insufficient for [] review").

23         Moreover, the ALJ's reliance on a minor discrepancy between Plaintiff's statement that

24   she got sober in 2007 versus 2008 appears to be misplaced, because either way she had not used

25   drugs since 2008.  See AR 723, 789.  This is far more akin to a symptom of forgetfulness than an

26   intentional, mendacious misrepresentation.  An ALJ may consider inconsistent statements about

27   drug use.  Thomas v. Barnhart, 278 F.3d 948, 959 (9th Cir. 2002) (in discounting credibility in

28   general, "the ALJ found that [the claimant] had not 'been a reliable historian, presenting

United States District Court
Northern District of California

conflicting information about her drug and alcohol usage'"). However, the statements that the ALJ relied on as to the timing of Plaintiff's prior drug use are not the type of inconsistent or self-serving statements about drug use for which a claimant should reasonably be deemed non-credible. There is no dispute that Plaintiff was previously addicted to drugs, as she self-reported many times. The immaterial discrepancy between whether she stopped using two years prior, or three years prior, is a very weak justification for finding her to be not credible. Similarly, the ALJ's focus on Plaintiff's statements relating to agoraphobia and driving are unconvincing, where it is undisputed that since 2008 she has only driven when necessary. See AR 24, 52, 99-100. The fact that Plaintiff lost her license for driving under the influence of prescription narcotics in December 2013 does not impact her reported agoraphobia symptoms dating back to 2008. In short, the reasons the ALJ gave for finding Plaintiff to have diminished credibility are not convincing.

The Commissioner counters that the ALJ found that Plaintiff's medical impairments could produce pain and other symptoms at the first step of the credibility analysis, but correctly found that Plaintiff's testimony -- such as that she could barely walk or get out of bed, could not stand long enough to prepare a meal, and could only pay attention for 5 minutes at a time (AR 23, 64-65) -- was inconsistent with medical evidence and did not support greater limitations than those imposed by the RFC assessment. Specifically, the Commissioner refers the Court to another portion of the opinion where ALJ noted Plaintiff's long history of headaches (AR 20) but pointed out that at one point medical imaging did not show any intracranial pathology (AR 20, citing AR 824). Further, according to the Commissioner, while Dr. Richardson noted that migraines were not controlled, her pseudotumor cerebri was controlled. AR 2160. Elsewhere in the opinion, the ALJ also noted evidence of Plaintiff's neck and back treatment, but that medical imaging did not support surgical intervention and continued medication and therapy was recommended. AR 20, citing AR 1503, 1640. Further, the ALJ noted that Dr. Cabaluna reported that Plaintiff was able to walk, and stood more than 10 minutes shifting her weight from side to side waiting for her ride after his examination was concluded. AR 24, 1446.

However, because the ALJ did not rely on these reasons to discount Plaintiff's credibility,

United States District Court
Northern District of California

1  the Court may not affirm the decision based on them.  See, e.g., Bray v. Astrue, 554 F.3d 1219,

2  1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the

3  ALJ's decision based on the reasoning and factual findings offered by the ALJ--not post hoc

4  rationalizations that attempt to intuit what the adjudicator may have been thinking."); Orn v.

5  Astrue, 495 F.3d 625, 630 (9th Cir. 2007) ("We review only the reasons provided by the ALJ in

6  the disability determination and may not affirm the ALJ on a ground upon which he did not

7  rely.").  The matter is also remanded for a reconsideration of Plaintiff's credibility.

8          E.      Credit-As-True Doctrine

9          Plaintiff requests that the Court credit as true the opinions of Dr. White and Dr. Zedek, as

10  well as Plaintiff's testimony regarding her symptoms, and reverse and remand the case for the

11  payment of benefits.  The Court declines to do so here.

12          Generally when the Social Security Administration does not determine a claimant's

13  application properly, "the proper course, except in rare circumstances, is to remand to the agency

14  for additional investigation or  explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th

15  Cir.2004) (citations omitted).  The Ninth Circuit has recently confirmed that the "ordinary remand

16  rule applies equally to Social Security cases." Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d

17  1090, 1099-102 (9th Cir. 2014). However, the Ninth Circuit has put forth a "test for determining

18  when [improperly rejected] evidence should be credited and an immediate award of

19  benefits directed." Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.2000) (quoting Smolen v.

20  Chater, 80 F.3d 1273, 1292 (9th Cir.1996)).  It is appropriate when: (1) the ALJ has failed to

21  provide legally sufficient reasons for rejecting such evidence; (2) the record has been fully

22  developed and there are no outstanding issues that must be resolved before a determination of

23  disability can be made; and (3) it is clear from the record that the ALJ would be required to find

24  the claimant disabled were such evidence credited.  Treichler v. Comm'r of Soc. Sec. Admin., 775

25  F.3d 1090, 1099-102 (9th Cir. 2014) (citing Varney v. Sec'y of Health & Human

26  Servs., 859 F.2d 1396 (9th Cir.1988)); see also Garrison v. Colvin, 759 F.3d 995, 1020-21 (9th

27  Cir. 2014).  Further, even in the "rare circumstance" that all three factors for the "credit as true"

28  doctrine are met, courts have the flexibility to remand for further proceedings "where an

evaluation of the record as a whole creates serious doubts that a claimant  is, in fact, disabled."

Garrison, 759 F.3d at 1021; see also Strauss v. Commissioner of the Social Security

Administration, 635 F.3d 1135, 1138 (9th Cir. 2011) (reversing remand for award of benefits

because a "claimant is not entitled to benefits under the statute unless the claimant is, in fact,

disabled, no matter how egregious the ALJ's errors may be").

While remand is appropriate for the reasons discussed above, the credit as true doctrine

will not be applied because there remains some doubt that Plaintiff is or was disabled, and whether

she was insured under Title II during any such period of disability.  Therefore the case is

remanded for a new hearing and decision.

IV.    CONCLUSION

Plaintiff's motion for summary judgment is GRANTED.  Defendant's cross motion for

summary judgment is DENIED.

**IT IS SO ORDERED.**

Dated:  January 25, 2017

_____
ELIZABETH D. LAPORTE
United States Magistrate Judge